UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
THOMAS ZANE

               Plaintiff,

   -against-

CITY OF NEW YORK, DAVID M.
FRANKEL, OLIVER PU-FOLKES, and
TIMOTHY LAROSE

             Defendants.
----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 11-CV-4961 (FB) (RER)

*Appearances:*
*For the Plaintiff*:
SHAHIN Y. MASHHADIAN, ESQ.
Cronin & Byczek, LLP
Suite C-120
1983 Marcus Avenue
Lake Success, NY 11042

*For the Defendants*:
KATHRYN E. LEONE, ESQ.
Assistant Corporation Counsel
New York City Law Department
100 Church Street, Rm. 2-102
New York, NY 10007

**BLOCK, Senior District Judge:**

      Plaintiff, Thomas Zane ("Zane"), asserts claims of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); 42 U.S.C. §§ 1983 and 1981; the First and Fourteenth Amendments of the United States Constitution; New York State Human Rights Law, N.Y. Exec. Law §§ 290-301 ("NYSHRL"); and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 to 8-703 ("NYCHRL").

      Zane, a lieutenant in a unit of the city Sheriff's Office, alleges that defendants discriminatorily retaliated against him and subjected him to a hostile work environment because he spoke out to defend a co-worker from race and gender discrimination and made

repeated requests to arm his unit with tasers. The taser requests are also the basis for his First Amendment claim. Zane also alleges that he was subject to retaliation because he was an outspoken union member. He relies on the same incidents to support his equal protection claim.

I

The following undisputed facts are taken from the parties' Rule 56.1 statements, depositions and the record evidence.

Zane is a former Lieutenant who worked in the Sheriff's Office of New York City, starting in 1987. He became Lieutenant after a promotion from Deputy Sheriff in September 1994.[1] Approximately ten years ago, Zane joined, and was involved in creating, Kendra's Unit as a division of the Sheriff's Office. Kendra's Unit conducts "removals" — a process of apprehending mentally ill individuals who have been non-compliant with their outpatient treatment regimens and bringing them to psychiatric hospitals for evaluations.

Although the Sheriff's Office is a division of the New York City Department of Finance ("DOF"), Kendra's Unit is funded by the New York City Department of Health and Mental Hygiene ("DHMH"). There is a Memorandum of Understanding between the DOF and the DHMH that sets forth the budget for Kendra's Unit and specifies the number of staff by rank, including: one lieutenant, one sergeant, and six deputy sheriffs. The

---

[1]Ranks within the Sheriff's Office include, in ascending order: Deputy Sheriff (Level I), Sergeant (also known as Deputy Sheriff Level II), Lieutenant, Undersheriff, First Deputy Sheriff, and Sheriff.

Memorandum of Understanding also includes an overtime allotment for the unit.

When Kendra's Unit dispatches a team to perform a removal, the team is staffed with a sergeant or lieutenant and includes as many deputy sheriffs that are available, preferably four or five. A mental health clinician accompanies the team. As is the case with all uniformed Sheriff's Office members, those on Kendra's Unit teams carry pepper spray, a firearm, and an ASP baton.[2] Over ten years, the plaintiff had to brandish his firearm once and never used the ASP baton; and throughout that same period, members of Kendra's Unit as a whole needed to use pepper spray on only four or five occasions. None of the uniformed personnel in the Sheriff's Office carries a taser. Kendra's Unit team members also carry handcuffs, ankle restraints, and leg shackles. Physical restraints, however, are not always necessary, and ninety percent of patients are compliant during removals. Over the years, plaintiff made repeated requests to have tasers issued to Kendra's Unit in addition to the other weapons and physical restraints the team carried; these requests were denied both informally and via formal memoranda.

In June and July 2008, plaintiff made multiple requests to recognize various members of Kendra's Unit with Exceptional Merit Medals. Later in 2008, Zane's direct supervisor, Chief Thomas Doyle, gave a unit citation to Kendra's Unit for excellence and recognized its members with a Unit Citation Breast Bar for their work on a particular case. Zane accepted the unit citation on behalf of the team.

On April 23, 2009, Zane requested that all the deputy sheriffs in Kendra's Unit be

---

[2]Armament Systems and Procedures, Inc. ("ASP") is a weapons manufacturer that provides equipment to law enforcement and private security companies.

promoted to Level II, the rank equal to Sergeant. Zane's direct supervisor was Undersheriff Thomas Doyle ("Doyle"). Doyle forwarded the request to his supervisor, defendant Timothy LaRose ("LaRose"), the Chief of Operations, giving it his apparent support. Despite that initial support, Doyle formally denied Zane's request on April 30, 2009, in a memorandum that cited budgetary constraints and explained that not every member of a unit could become a supervisor, which would result if the deputy sheriffs were promoted to sergeant level.

Four months later, on August 31, 2009, following a review of work activity in his departments, LaRose wrote to Doyle asking for details of how Kendra's Unit members spent their administrative time at the base when they were not out doing field work. He asked Doyle for details and logs of future time.

The following month, on September 4, 2009, a Kendra's Unit staff meeting was held with the plaintiff in attendance along with Doyle, LaRose, and another Lieutenant, Sylvia Bowen ("Bowen"). LaRose's supervisor, First Deputy Sheriff Oliver Pu-Folkes ("Pu-Folkes"), attended as well as Pu-Folkes's supervisor, Sheriff Lindsay Eason ("Eason") and Dr. Monica Medina ("Dr. Medina"), who oversaw the clinicians who accompanied the field teams.

During the meeting, Zane objected when discussion occurred about requiring Bowen to go into the field. Even though field work was part of the lieutenant job description, Zane objected for multiple reasons, including Bowen's age (she was approximately 50 years old), gender, and because the lieutenant job was primarily administrative. Zane was advised that age cannot be a factor in considering whether an

employee is fit for assignment to field work. Following the meeting, Zane had a separate discussion with Eason and Pu-Folkes where he told them that making Bowen perform field work was "wrong, that she was a female and she was black, this is going to cause problems for you." Zane Dep., Ex. B, at 57. He shared his belief that "it would result in some kind of EEO issue . . . by Lt. Bowen." *Id.* at 115-116. Zane testified that he knew these problems were coming "before Lieutenant Bowen knew it." *Id.* at 57.

Although it is unclear whether there was any discussion about uniforms at the meeting, the parties agree that Doyle communicated via e-mail on September 18, 2009, a new policy requiring that "all uniformed personnel must be in uniform within five minutes after the start of when they begin their tour." Defs.' Decl., Ex. G. On September 21, 2009, Zane replied to Doyle's message and urged reconsideration of the decision to implement the new policy. Zane also carbon copied other employees, including his subordinates, on his reply, indicating that it "serves no purpose" and asking if it was for "punitive reasons." *Id.* On October 1, 2009, Doyle issued a counseling letter to Zane. Doyle acknowledged that the plaintiff may not have understood that the policy applied to all members of the Sheriff's Office, and not exclusively to Kendra's Unit, and he instructed Zane to "recognize that in the future you should not use e-mail in this manner to criticize a superior's decision." Defs.' Decl., Ex. H.

On October 27, 2009, Zane received another counseling letter, which explained that, in reference to the September 4 discussion about assigning field work to employees, age cannot be a factor because doing so "would be a violation of equality laws." Defs.' Decl., Ex. J. Doyle also encouraged Zane to speak to him, to the DOF Equal Employment

Opportunity ("EEO") Officer, or to the EEO Attorney for any questions or additional support. *See id.*

On January 13, 2010, the Commissioner of the DOF, defendant David M. Frankel ("Frankel"), issued a memorandum to all DOF employees regarding performance evaluations. Frankel advised the department that he expected "only a small percentage of Finance employees will receive the top evaluation ratings," because, going forward, the department needed to improve its evaluations to ensure that managers and employees receive constructive feedback. Mem. From David M. Frankel to All Finance Employees, Defs.' Decl., Ex. P. Frankel's memorandum was designed to stop the practice where DOF employees "were routinely given the highest evaluation ratings simply for doing their job." *Id.* Later that year, Zane rated 100% of his subordinates as "outstanding" — the highest possible rating — and LaRose asked Doyle to have Zane re-do the evaluations. Zane refused. On September 13, 2010, both Doyle and Zane received a memorandum from LaRose documenting their failure to have Zane's performance evaluations adjusted to comply with Frankel's directive.

In December of 2011, Zane was among six applicants for a position as Undersheriff. Interviews with staff at the Sheriff's Office and the DOF were scored, and the top three scorers moved on to the next round of the application process. Zane was not among the top three scorers and was not promoted to the position.

On January 23, 2012, Zane was transferred from Kendra's Unit (based in Long Island City, Queens), to the Kings County Office of the Sheriff's Office. Zane did not request the transfer, but was told that he was the "only lieutenant who could handle Brooklyn because

Brooklyn is messed up."  Zane Dep., Defs.' Decl., Ex. B, at 45.  This was not the first

transfer, nor was it Zane's first involuntary transfer.  As he testified in his deposition:

> ZANE:  I was in the Bronx as a lieutenant yes, and I was
> probably back to Scoff at some point, I jumped around
> a little and I have been transferred a lot.
>
> Q:  Did you request to be transferred, how do the transfers
> work?
>
> ZANE:  Sometimes I requested it, sometimes I didn't.

*Id.* at 12.  Zane also testified that he liked working at the Kings County Office and his salary

remained the same.

Throughout his time with the Sheriff's Office, Zane also requested overtime for

himself and his unit.  He earned overtime pay during the years 2009, 2010, and 2011.  The

amount of overtime granted to him, his unit, and the DOF as a whole decreased under

Frankel, who became Commissioner of the DOF in 2009.  The reduction was dramatic —

e.g., there was an approximate 74% decrease in DOF overtime from fiscal year 2008 to fiscal

year 2009.  Nonetheless, all of Zane's requests for overtime to complete removals were

approved, a fact he attributes to Kendra's Unit being short-staffed.  In 2012, following

Zane's transfer to the Kings County Office, there were opportunities for overtime that he

chose not to take.

Finally, in September 2012, after 25 years of service, Zane retired from the Sheriff's

Office.

## II.

Zane's complaint alleges that defendants retaliated against him for speaking out in

defense of Bowen at the September 4, 2009, meeting; subjected him to a hostile work environment; and subjected him to retaliation because he was an outspoken union member. Zane also makes a generalized claim of equal protection violations.[3] In support of these claims, he alleges that defendants:

- denied his repeated requests for tasers

- denied his requests in 2008 to give his subordinates special recognition and commendations

- denied his requests in April 2009 to promote his subordinates

- micromanaged him starting in August 2009

- issued a policy in September 2009 that required all personnel in the Sheriff's Unit to be in their uniforms within five minutes of the start of their tours of duty

- issued him various memoranda concerning: his use of e-mail in September 2009 to criticize a supervisor, his advocacy of using factors to determine field assignments that violate EEO policies, and his failure to follow Frankel's 2010 directive regarding performance evaluations

- failed to promote him to Undersheriff in December 2011

- transferred him to the Kings County Office

Zane also asserts that he was well known as a union member and, as of September 2009, became Director of Grievances for the union.

The Court grants summary judgment "whenever it determines that there is no genuine issue of material fact to be tried." *Savino v. City of New York*, 331 F.3d 63, 71 (2d

---

[3]At oral argument on defendants' summary judgment motion, plaintiff withdrew his § 1983 claim for municipal liability.

Cir. 2003) (citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). The Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Id*. (citing *Anderson*, 477 U.S. at 255). Where, however, the non-moving party bears the burden of proof at trial, the moving party need only "'show[]' — that is, point[] out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Upon such a showing, "the non-moving party must respond with 'specific facts showing that there is a genuine issue for trial,'" *Golden Pac. Bancorp. v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)); conclusory statements, conjecture and other types of unsupported assertions are not sufficient. *See Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14 (2d Cir. 1995).

As the Second Circuit has observed, summary judgment in a discrimination case should be granted with caution "because 'smoking gun' evidence of discriminatory intent is rare and most often must be inferred." *Forsyth v. Federation Employment & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005). Summary judgment is nevertheless appropriate when "the moving party has submitted facts sufficient to show that the non-moving party's claim has no merit, and the non-moving party's attempts to rebut the movant's facts consist only of 'mere allegations or denials' of the facts asserted by the movant." *Id*. at 570 (quoting Fed. R. Civ. P. 56(e)).

**A. Retaliation**

"Title VII's antiretaliation provision forbids employer actions that discriminate against an employee (or job applicant) because he has opposed a practice that Title VII forbids." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59-60 (2006) (internal quotations omitted); *see also* 42 U.S.C. § 2000e-3(a). Title VII and the state and local human rights law claims are analyzed under the three-step burden shifting approach first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 377 (2d Cir. 2003) ("We analyze plaintiff's federal and state law discrimination claims together since in other contexts we have applied federal standards of proof to discrimination claims under the state Human Rights Law."). To make a *prima facie* case of unlawful retaliation, a plaintiff must prove that: "(1) he participated in a legally protected activity; (2) his employer knew of the protected activity; (3) an adverse employment action ensued; and (4) a causal connection existed between the protected activity and the adverse employment action." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006). Once a *prima facie* case is established, "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the termination." *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 221 (2004) (quotations and citations omitted). Finally, at the third step, if "the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

"The plaintiff's burden at the beginning of the case is a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001). Because Zane's retaliation

claim is based on his purported defense of Bowen at the September 4, 2009, Sheriff's Office meeting, events that occurred prior to that date could not have been in retaliation for his activity at the meeting. This includes Zane's recounting of being denied various requests in the summer of 2008 to give his subordinates special recognition and his April 2009 request to promote his deputy officers. Even assuming Zane's defense of Bowen was a protected activity, both the recognition and promotion requests fail to establish a *prima facie* case of retaliation. And even if they did, it is undisputed that Kendra's Unit was recognized as a whole in 2008 with a citation and given a Unit Citation Breast Bar. Furthermore, although Zane alleges that micromanaging began only after the September 2009 meeting, the record shows that it was the preceding month when LaRose began inquiring into the details of how Kendra's Unit members spent their administrative time. This dovetails with the general focus that Frankel had on controlling costs and decreasing expenditures after he assumed his role as Commissioner of the DOF.

As for the September 4, 2009, departmental meeting, the evidence is insufficient to support that Zane engaged in protected activity. "Protected activity" includes opposition to discriminatory employment practices or participation in any investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a). The Second Circuit has stated that "informal protests of discriminatory employment practices, including making complaints to management" satisfy the requirement. *Hubbard v. Total Commc's, Inc.,* 347 Fed. Appx. 679, 381 (quoting *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990)). But in opposing a discriminatory employment practice, although an employee "need not establish that the conduct he opposed was in fact a violation of Title VII," he must have had at least

a "good faith, reasonable belief" that the underlying employment practice was unlawful. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178-80 (1996) (discussing the good faith, reasonable belief requirement at length); *see also, Kwan v. Andalex Group LLC,* — F.3d —, *7 (2d Cir. 2013) (quoting the well-established rule from *Reed*).

Zane testified that when he objected to Bowen's assignment to field work he knew that field work was part of Bowen's job description as a lieutenant. Rather than articulate a concern that Bowen's assignment was motivated by unlawful discrimination, Zane spoke out because the department was *not utilizing* considerations that are prohibited by law, namely Bowen's age and gender. Zane testified that his objections were also based on his belief that the lieutenant job was primarily administrative, and that lieutenants rarely went into the field — neither belief contemplates discriminatory motivations.

Similarly, Zane's comments made during the private meeting with Eason and Pu-Folkes can, at best, be understood as a warning of possible work-related issues and not as a complaint about discrimination. His recommendation for his superiors was that they alter their decision with respect to Bowen by engaging in precisely the sort of considerations that would expose the Sheriff's Office to legitimate EEO liability — a concern that was explained to Zane in Doyle's memorandum of October 27, 2009. Doyle also encouraged Zane to speak to him, to the DOF Equal Employment Opportunity ("EEO") Officer, or to the EEO Attorney for any questions or to obtain additional support.

In short, defendants could not reasonably have understood Zane's comments, which were critical of the department for failing to utilize prohibited bases for employment decisions, to be a complaint that they were engaging in unlawful discrimination.

Therefore, Zane cannot establish that he engaged in protected activity and he cannot make out a *prima facie* case of retaliation.

Moreover, many of the allegations detailed by Zane are either unsupported by the record or they provide no evidence that Zane suffered an adverse employment action. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68. As the Supreme Court explained: "The antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms." *Id.* It does this by "prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC." *Id.* (quotations omitted).

LaRose's inquiry into the details of an entire department's activities (i.e., micromanaging), Doyle's counseling memoranda, and the agency-wide requirement that uniformed employees wear their uniforms cannot be adverse employment actions after *Burlington*. The Court rejects the notion that these actions create a deterrent, and even more telling: Zane himself argues that he *continued* to be outspoken. As for Zane's allegations that he was denied overtime, the undisputed record shows that he was never denied overtime requests for removals and that he declined overtime opportunities in 2012 after being transferred to a job that he liked.

Finally, there must also be a "causal connection" that links any alleged protected activity to an adverse employment action. *Kessler v. Westchester Cty. Dep't of Soc. Svc's.*, 461 F.3d 199, 206 (2d Cir. 2006). "The causal connection needed for proof of a retaliation claim

can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Summa v. Hofstra Univ.,* 708 F.3d 115, 127-28 (2d Cir. 2013). "[E]ven gaps of four months" between the activity and the adverse action "can support a finding of causation" that is sufficient for a *prima-facie* case. *Id.* at 128.

Zane's final examples of retaliation were his failure to be selected for a promotion to Undersheriff in December 2011 and his transfer to the Kings County Office in Brooklyn in January 2012. However, the interviews for the Undersheriff position occurred more than two years after Zane spoke out in anticipatory defense of Bowen. Similarly, the transfer occurred the following January, 2012, more than 29 months after the September 4, 2009 meeting. The job applicants for the Undersheriff position were scored on their first-round interviews, and the three highest-scoring applicants were those selected to advance to the next round. Zane did not achieve one of the three highest scores and he provides no evidence, aside from conclusory statements that he was denied the promotion because of ongoing retaliation, that the decision was based on any consideration other than the scores.

Thus, because Zane fails to establish a *prima facie* case of retaliation, and he also fails to show that he suffered any adverse employment action or that the necessary causation exists, he cannot satisfy his burden. Summary judgment is granted on the retaliation claims.

## B. Hostile Work Environment

"The standards for a hostile work environment claim under Title VII, § 1981, [and] NYSHRL . . . generally are the same." *Citroner v. Progressive Cas. Ins. Co.*, 208 F. Supp. 2d 328, 339 (E.D.N.Y. 2002) (citing *Whidbee v. Garzarelli Food Specialties*, Inc., 223 F.3d 62, 69 (2d

Cir. 2000)).  A plaintiff alleging that he has been subjected to a hostile work environment based on a protected ground must come forward with sufficient evidence to show "that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano,* 294 F.3d at 374 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17 (1993)).  Only "harassment that transcends coarse, hostile and boorish behavior can rise to the level of a constitutional tort." *Davis v. Passman,* 442 U.S.  228 (1979).

In addition to Zane's federal and state claims, the NYCHRL claim must be given "an independent liberal construction." *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268 (2d Cir. 2009), 278 (quoting *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)).  Failure to do so is error.  *See Mihalik v. Credit Agricole Cheuvreux North America, Inc.,* 715 F.3d 102, 109 (2d Cir. 2013). While the Second Circuit has not defined the particular contours of the review standard, at minimum the "City Code provides somewhat broader rights." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 97 (2d Cir. 2012).  The Court will, therefore, construe the NYCHRL provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik,* 715 F.3d at 109 (citations omitted).

**1. Federal and state claims**

"It is axiomatic that mistreatment at work, whether through subjection to a hostile

environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir. 2001). Zane's claims must fail because he offers no allegation that he has suffered discrimination on account of a protected ground, such as race or gender.

Instead, the allegations and evidence he offers are the same as those he used to support his claim of discriminatory retaliation. Even if they did constitute discriminatory misconduct, they once again fail to satisfy his burden because micromanagement, enforcement of the uniform wearing requirement, and issuing counseling memoranda do not rise to a level that is sufficiently "severe or pervasive" such that they altered the "terms and conditions" of employment. *Alfano,* 294 F.3d at 374. Micromangement does not constitute a severe or pervasive activity, and the requirement to wear uniforms—which applied to all members of the Sheriff's Office—existed before 2009. Zane provides nothing more than conclusory theories that the entire motivation for enforcing the requirement was part of a personal attack on him.

The counseling memoranda that Zane received were brief and limited in scope: they outlined department policies for appropriate ways to criticize supervisors, articulated the EEO Attorney's concerns, and reviewed Frankel's requirements for all DOF performance evaluations. None of these supports a finding that Zane suffered hostile work conditions.

Summary judgment is granted on Zane's Title VII and state hostile work environment claims.

**2. City law claim**

An independent analysis of Zane's city claim shows that it also fails. The Second Circuit has relied upon state court interpretations of the NYCHRL following the decision in *Williams v. New York City Housing Authority,* 872 N.Y.S.2d 27 (1st Dep't 2009), which formed the basis for the requirement that NYCHRL be analyzed separately from federal and state claims. In that vein, the Court turns to *Hernandez v. Kaisman,* 957 N.Y.S.2d 53 (1st Dep't 2012), which discussed *Williams* at length in the context of a gender discrimination suit.

The plaintiffs' evidence in *Hernandez* fell short of the "severe and pervasive" standard required under federal law, but met the *Williams* standard required to defeat summary judgment on the city law claim because "[t]he record support[ed] plaintiffs' claim that defendant took a perverse pleasure in demeaning and embarrassing his female employees. This was obvious from his statements, related by plaintiffs, concerning, in the case of Hernandez, the size of her breasts, and in the case of Herarte, the size of her backside." *Id.* at 59.

That type of animosity is absent from the evidence that Zane presents in connection with the Sheriff's Office managers. Instead, the evidence is lacking in the places where it would mostly likely appear. For example, Zane and his team were recognized for their work with a special commendation in 2008, and Zane was repeatedly told by Doyle throughout the record that Kendra's Unit performed excellent work. In the instances cited by Zane, the department either implemented procedures that applied to all members of the DOF (e.g., Frankel's performance evaluation memorandum), all members of the Sheriff's Office (e.g., the uniform wearing requirement); or all members of Kendra's Unit (e.g.,

LaRose's request to account for administrative activities while not conducting field removals). None of these amounts to anything approaching the type of discriminatory workplace environments contemplated in *Hernandez* or *Williams*.

Thus, the evidence—even viewed broadly in favor of Zane under the more liberal analysis required for city law claims—fails to create a triable issue of fact for him to survive summary judgment. At most, a reasonable fact finder could conclude that Zane disliked the greater role that senior managers began to take in controlling the costs and overseeing the activities of Kendra's Unit. Accordingly, defendants' motion as to the NYCHRL hostile work environment claim is also granted.

## C. First Amendment

To establish a claim for First Amendment retaliation a plaintiff must show that "(1) [his] speech was constitutionally protected; (2) [he] suffered from an adverse employment action; and (3) [his] speech was a motivating factor in the adverse employment determination regarding [him]." *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002).

Analysis of whether a public employee's speech is protected by the First Amendment proceeds in two parts. The court "must initially decide whether the speech addressed a matter of public concern," and if so, it "must then balance the employee's First Amendment right to engage in the speech against the interest of the government employer in providing effective and efficient public service, in a weighing commonly referred to as the *Pickering* balancing test." *Hoyt v. Andreucci,* 433 F.3d 320, 329 (2d Cir. 2006). The first question, whether the speech is a matter of public concern, is a question of law where the Court considers "the content, form, and context of a given statement as revealed by the

whole record." *Id.* at 330. The speech is analyzed to determine whether it relates to "any matter of political, social, or other concern to the community," and "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Id.* "It is true, of course, that mere employee grievances do not qualify as matters of public concern." *Id.*

First, Zane alleges that he made complaints about safety issues on the job, which he clarified in his testimony were limited to his requests for tasers:

> Q:        Besides the e-mail that you mentioned about the taser guns, did you complain about other safety issues?
>
> ZANE:     No, that was the main issue. That I could remember.

Zane Dep., Pl.'s Decl., Ex B, at 63-64.[4]

His comments, when viewed in context, show that he was complaining about working conditions and not speaking with a view to public concerns. The taser request followed an incident in which two Kendra's Unit deputy sheriffs were "seriously hurt and a lieutenant got hurt." *Id.* at 61-62. As Zane explained, "If we had the taser, that might have been avoided and I felt that we should have the taser. And not that we would use it. We had an unbelievable track record of showing restraint, but just to have in that once [sic] instance where we needed it." *Id.* Thus, Zane's speech regarding the tasers was not on a matter of public concern and was therefore not constitutionally protected.

Furthermore, Zane's union activities were not addressed to matters of public

---

[4]Zane alleged in his complaint that he also made a formal complaint to the Occupational Health and Safety Administration ("OSHA"), but clarified in his deposition that he never made such a filing. *Id.* at 62.

concern.  Instead, as Grievance Director, he brought grievances based on alleged violations of the union's collective bargaining agreement.  Zane also explained in his deposition that when he had previously testified in court in his role as Grievance Director, he was "trying to save deputies from being laid off." Zane Dep., Defs.' Decl. Ex. B, at 135.  He fails to provide any evidence beyond conclusory allegations that he suffered an adverse employment action.  Summary judgment is therefore granted for defendants on the First Amendment claims.

**D. Equal Protection**

Zane offers, respectively, "selective enforcement" and "class of one" theories to proceed on his equal protection claim.  Under the first theory, he must show that 1) "compared with others similarly situated, [he] was selectively treated;" and 2) "that such selective treatment was based on impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights." *Brown v. City of Syracuse,* 673 F.3d 141, 151-52 (2d Cir. 2012) (internal quotations omitted).  Alternatively, under the "class of one" theory, he must show that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Thus, Zane argues that he can prevail if he shows that the government, in singling him out, either had an impermissible reason for mistreating him or that it had no reason at all.

First, Zane cannot proceed with a class of one argument because the Second Circuit has confirmed that the Supreme Court's decision in *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 607 (2008), made it unavailable in the public employment context. *Conyers v. Rossides,*

558 F.3d 137, 151-52 (2d Cir. 2009) (quoting *Engquist*: "Our traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations applicable when the government acts as employer as opposed to sovereign, lead us to conclude that the class-of-one theory of equal protection does not apply in the public employment context." 553 U.S. at 598).

Zane also cannot show that he was mistreated for any impermissible reason. He concedes that his equal protection claim is not based on any allegation that he is a member of a protected class or that he suffered discrimination because of a protected ground. He also failed to show that he engaged in any constitutionally protected speech. What remains is a general allegation that he anticipated a potential EEO problem with his co-worker, and this cannot survive a motion for summary judgment on his equal protection claim.

## IV.

For the foregoing reasons, summary judgment is granted for defendants on all claims.[5]

**SO ORDERED.**

/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

March 13, 2014

_____

[5]Having dismissed the federal claims, the Court could have declined to exercise supplemental jurisdiction over the state and city law claims. *See* 28 U.S.C. § 1367(c). Judicial economy is best served here by exercising supplemental jurisdiction and dismissing the non-federal claims. *See Chambers v. Capital Cities/ABC*, 851 F. Supp. 543, 545 (S.D.N.Y. 1994) ("Duplicative litigation at multiple levels of government involving the same facts [is] contrary to the objectives of the Supplemental Jurisdiction Act and the public interest.").

Brooklyn, New York